# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRIAN WHITE,                              :
        Plaintiff,                        :
                                          :
v.                                        :        3:08-cv-1168 (CFD)
                                          :
STATE OF CONNECTICUT, DEPARTMENT OF :
CORRECTIONS,                              :
        Defendant.                        :


## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Brian White, brought this action pursuant to Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e et seq., alleging race discrimination and retaliation. The

defendant, the State of Connecticut Department of Corrections ("DOC"), moves for summary

judgment claiming that White cannot demonstrate discriminatory intent, pretext, or retaliation as

a matter of law. For the reasons that follow, the defendant's motion for summary judgment is

denied.

## I.    Factual Background[1]

White began his career with the DOC in January 1994 as a Correctional Officer at the

Bridgeport Correctional Center. From 1994 until 2004, White worked at a number of different

correctional facilities in Connecticut. In 2004, White was promoted to Lieutenant and transferred

to the York Correctional Institution in Niantic, Connecticut. As a Lieutenant, White was

responsible for the safety and security of the prison and for upholding the rules and regulations of

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary
judgment briefs, and other evidence submitted by the parties. They are undisputed unless
otherwise indicated.

the prison facility.

White was dismissed from the DOC in August 2006. The alleged basis for White's dismissal stemmed from a situation with a female inmate, Kathy Rivera. In late February 2006, White reported receiving sexually explicit notes from Rivera.[2] White had waited approximately one or two weeks before reporting the notes, claiming he had not immediately read the first note. On March 1, 2006, the Security Division of the Department of Corrections received a referral from then Commissioner Theresa Lantz authorizing an investigation into possible inappropriate conduct between White and Rivera. During the pendency of this investigation White was transferred to a different correctional facility.

When interviewed as part of the investigation, Rivera alleged that she and White had been involved in a "mental and physical relationship" which included "touch[ing] and rubb[ing] each other's bodies to include each other's intimate areas" as well as "flirt[ing,] . . . shared sexual fantasies and conversations. . . [and] several notes to Lieutenant White detailing sexual fantasies between the two."[3] Rivera also claimed that she and White would write notes to each other in a notebook that White kept in his uniform pocket. White stated that he did not initiate a relationship with Rivera and that they never touched each other or flirted with one another. When asked more specific questions about his relationship with Rivera, White frequently answered that he "could not recall" or qualified his negative responses as being "not to [his] recollection."

---

[2] White initially reported receiving only one such note from Rivera, but later reported and submitted two notes.

[3] Rivera had a history of making claims of sexual conduct with corrections officers.

Captain Roger Bowles—who conducted the investigation—determined that White violated Administrative Directives 2.17 and 6.6 by exhibiting unprofessional behavior, poor judgment, and engaging in undue familiarity by showing favoritism to a female inmate.[4] Bowles also concluded that White was less than truthful and failed to cooperate during the investigation. White denies that he was uncooperative or untruthful.

On May 30, 2006, White attended a pre-disciplinary conference where he was given an opportunity to rebut the charges against him. At the conference White was able to give a statement. Also at the hearing, the statements of two correctional officers—Officer Frank Colmenares and Officer Philip Brown—were considered. Colmenares and Brown both had negative interactions with White in the past year.[5] These officers claimed that they had previously seen White talking furtively with Rivera and saw Rivera hand White a notebook. Excerpts from the facility logbook written by Browne detailing this interaction were considered against White,[6] despite Warden Lori Ricks noting that it appeared Browne was acting in a discriminatory manner by keeping such detailed accounts of White.

---

[4] Administrative Directive 2.17 reads, in relevant part, "Each employee of the Department of Correction shall engage in appropriate and ethical conduct while carrying out official duties . . . . The following behavior shall be strictly prohibited . . . . Engag[ing] in undue familiarity with inmates . . . ." Administrative Directive 6.6 (Reporting of Incidents) reads, in relevant part, "The Department of Correction shall ensure that all incidents and emergencies are reported in a complete, accurate and timely manner."

[5] Specifically, White had been part of an investigation regarding alleged sexual impropriety by Colmenares and had filed administrative complaints about harassment of inmates by Browne. Furthermore, Colmanares had filed grievances regarding discrimination against White in early 2006, and Brown had filed an official complaint against White in 2005.

[6] The entry read, in relevant part, "Lt. White in unit – pulled I/M Rivera . . . out of H-1 to talk to her in the common area in a low voice tone. . . . Lt. White turned on the t.v. and I/M Rivera showed him a notebook. . . . Lt. White leaves unit."

On June 30, 2006, White filed a complaint with the DOC Affirmative Action Office alleging discrimination based on his race because of the investigation and because he had been transferred to another prison pending the investigation. On August 7, 2006, Warden Ricks sent a letter to White notifying him of his dismissal. The decision to dismiss White was recommended by a number of individuals, including two African American females. Following his dismissal, White filed a complaint with the Commission on Human Rights and Opportunities ("CHRO") alleging race discrimination and retaliation. That complaint was dismissed. White's union also filed a grievance on his behalf regarding his termination. White's dismissal was upheld by an independent arbitrator who found no disparate treatment, although White claims this decision as based on incomplete information.

During the above proceedings, White compared himself to a number of "similarly situated" employees who were also allegedly charged with "undue familiarity." Here, however, White only compares himself to the three other staff members who had been accused of sexually improper conduct with Rivera—Correctional Officer Jamie Donovan (a Caucasian female), Correctional Officer Stuart Pelkey (a Caucasian male), and Correctional Officer Darryl Friedman (a Caucasian male). White claims that all three of these individuals were not disciplined despite the fact that all three had been accused of engaging in sexual conduct.

During an interview with Rivera in February or March 2006, Rivera implicated four individuals, Donovan,[7] White, Pelkey, and Friedman, of having sexual contact with her. In

---

[7] In early January 2006, four staff members reported that they observed Correctional Officer Donovan spending an inordinate amount of time with Inmate Kathy Rivera, including spending five hours in Rivera's cell at one time. As a result of these observations, an investigation of Officer Donovan was later commenced regarding issues of possible "undue familiarity."

support of her claim of sexual contact with Donovan, Rivera contended that she could identify the locations of Donovan's tattoos and body piercings. Rivera also alleged that Donovan gave her a gold colored wedding band and gold necklace, offered to bring her food from McDonald's, and spent Christmas Day with her. Other correctional officers reported to the investigator that they had witnessed Donovan conversing with Rivera for multiple hours on more than one occasion, including for approximately five hours on Christmas Day. Donovan denied these allegations. Donovan was placed on administrative leave with pay during the pendency of her investigation.

Rivera alleged that the relationship with Pelkey included "kissing, groping, touching, skin to skin and mouth to skin contact along with long conversations of a personal nature." Rivera was able to report a number of personal details about Pelkey and his family. She also claimed that Pelkey had given her jewelry, including a piece of jewelry that had been confiscated from her in February 2006. Rivera's allegations against Friedman similarly consisted of kissing, kissing Rivera's neck and chest, and Rivera grabbing Friedman's groin over his clothes. Both Pelkey and Friedman denied these allegations.

With regard to Officer Pelkey, on April 25, 2007, the Security Division completed its investigation and found that no departmental directives were violated and, although Rivera did know some personal information about Pelkey, "[h]ow that information was obtained [was] questionable." Similarly, on February 7, 2007, the Security Division concluded that there was a lack of evidence as to Officer Friedman, and that the allegations of undue familiarity could not be substantiated.

The initial investigation of Officer Donovan found her to be in violation of

Administrative Directive 2.17 and various General Post Orders.  Additionally, prior to her pre-disciplinary conference, the Deputy Commissioner of Operations noted that Officer Donovan was "less than truthful in the investigation," and "based on the amount of time spent with [Rivera] there exists justification to substantiate undue familiarity."[8]  After the Loudermill hearing, however, DOC found no violation of Administrative Directive 2.17 (undue familiarity), even though it found that Donovan "frequently came into a unit and engaged in conversation with a particular inmate for extended periods of time."  Ultimately, Donovan received a letter of "formal counseling" and was reassigned to a different location.

White contends that the disparity in treatment between himself and these three correctional officers demonstrates discrimination based on his race and in retaliation for his administrative complaints.  The DOC moves for summary judgment, arguing that White cannot demonstrate an inference of discriminatory intent, pretext, or retaliation.

## II.    Discussion

### A.    Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

---

[8] Other pre-Loudermill comments were similar: "This writer [Director of Security] believes Officer Donovan was 'untruthful' during the investigation in answering questions.  It is apparent that she spen[t] an inordinate amount of time in visiting/speaking w[ith] I/M Rivera as witnessed by numerous staff . . ."; "Please Loudermill up to dismissal for numerous violations . . ."; and that the instances of visiting "taken in their entirety demonstrates C/O Donovan was . . . not able to control her behavior."

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When examining a motion for summary judgment the Court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. Patterson v. County of Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). However, a party may not create a genuine issue of material fact by resting on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

B.      Discrimination in Violation of Title VII

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Courts analyze these claims under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this standard, to establish a prima facie case of discriminatory treatment based on an adverse job action, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under

circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Once a plaintiff has established a prima facie case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). If the defendant is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." Id.

"Direct evidence of discrimination is not necessary, because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file. Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (internal citations omitted). The plaintiff may establish a genuine issue of material fact either through statistical or circumstantial evidence that the employer's reasoning is false and that discrimination motivated the employer. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994).

*i.*     *Prima Facie Case*

Here, it is undisputed that White was a member of a protected class, was qualified for the position he held, and suffered an adverse employment action through his termination. DOC argues, however, that White cannot demonstrate any inference of discriminatory intent. White claims that he can demonstrate an inference of discriminatory intent because similarly situated Caucasian employees were treated differently than he. Specifically, White claims that the three Caucasian officers Rivera also accused of sexual misconduct were not dismissed.

A plaintiff may raise an inference of discriminatory intent by demonstrating that he was treated differently than those with whom he is "similarly situated in all material respects." See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Graham, 230 F.3d at 39. In some cases, however, this issue may be resolved as a matter of law. Acas v. Conn. Dep't of Corr., No. 3:06cv1855 (JBA), 2008 U.S. Dist. LEXIS 76031, at *7 (D.Conn. Sept. 29, 2008). To be "similarly situated in all material respects," the individuals do not need to be identical; rather, what constitutes "all material respects" varies slightly from case to case and includes "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham, 230 F.3d at 40.

DOC argues that White is not similarly situated with Donovan, Pelkey, and Friedman because they are correctional officers and, as a supervisor, White is held to higher standards. See Acas, 2008 U.S. Dist. LEXIS 76031 at *10 (finding that one reason the plaintiff was not "similarly situated" to the proposed individual was because he was a DOC Lieutenant and the

other individual, who was not, was not "subject to the same workplace standards").  "Although an employee's position is relevant to the analysis, employees need not be of the exact same rank to be considered 'similarly situated.' " <u>Gorzynski v. Jetblue Airways Corp.</u>, 596 F.3d 93, 109 n.7 (2d Cir. 2010) (examining evidence that younger non-supervisory employees were allowed to break policies with impunity as part of the prima facie case for discrimination as well as pretext); <u>see also</u> <u>Polito v. Tri-Wire Eng'g Solution, Inc.</u>, 699 F. Supp. 2d 480, 493 (E.D.N.Y. 2010) (noting that although plaintiff was a supervisor and the other individual was not, because they "committed transgressions of comparable seriousness" the Court could not find as a matter of law that they were not similarly situated).

Although White is a Lieutenant, viewing all facts in the light most favorable to the plaintiff, this difference in rank is insufficient to deem White not similarly situated with Donovan, Pelkey, and Friedman.  By its terms, Administrative Directive 2.17 applies to "[e]ach employee of the Department of Corrections."  DOC claims that this directive was applied more stringently to supervisory employees; however, the DOC has provided no evidence to support this argument here.  Therefore, this case is distinguishable from the situation facing the Court in <u>Acas</u>.

In <u>Acas</u>, the Court found that although Administrative Directive 2.17 applied to all employees, the " 'workplace standards' to which Mr. Acas was subject, and pursuant to which he was evaluated, were *supervisor-specific*."  <u>Acas</u>, 2008 U.S. Dist. LEXIS 76031 at *13–*14 n.3 (emphasis added).   There, the DOC provided evidence that the plaintiff was evaluated pursuant to the "Supervisors Performance Evaluation," and that the plaintiff needed to effectively perform "supervisor-specific skills and responsibilities."  <u>Id.</u> at *12.  Acas's apparent failures were

regarded as "supervisor-specific" including "becom[ing] a poor role model" and failing to "portray leadership and responsibility." See id.

There does not appear to be any such "supervisor specific" evidence in this case. Here, the investigatory report and the recommendations for dismissal do not mention any violations that were "supervisor-specific," instead focusing simply on White's behavior in allegedly violating the universally applicable Administrative Directive 2.17. Thus, viewing all of the facts in the light most favorable to the plaintiff, it does not appear that White's dismissal was based on different "workplace standards" due to his position as Lieutenant.

This case is further distinguishable from Acas in that here, a reasonable trier of fact could conclude that the conduct at issue in each instance is of comparable seriousness. See id. at *15. Conduct does not have to be identical to be considered "comparably serious;" rather the Court must look to the context and circumstances surrounding the acts to determine whether the facts are "reasonably close." See Graham, 230 F.3d at 40. Rivera accused all four individuals of sexual contact with her, specifically some form of kissing and touching. Although White was the only individual who received sexual notes, Rivera claimed other comparably serious conduct by Donovan, Pelkey, and Friedman. For example, she stated that she had personal conversations with Donovan and Pelkey and that both Donovan and Pelkey gave her gifts. There were also statements by various witnesses that Donovan spent numerous hours with Rivera, including allegations that Donovan spent the day in Rivera's cell on Christmas. Therefore, viewing the facts in the light most favorable to the plaintiff, a reasonable jury could find that White's conduct was of comparable seriousness to that of Donovan, Pelkey, and Friedman.

DOC argues that even if White's conduct is comparable and measured against the same

standards as Donovan, Pelkey, and Friedman, these officers are not similarly situated to White because their disciplinary decisions were made by different decisionmakers. Specifically, each of the initial investigations was conducted by a different individual.[9] To be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff. See Ellis v. United Parcel Serv., Inc., 523 F.3d 823, 826 (7th Cir. 2008); see also Jeunes v. Potter, NO. 3:08CV1218 (HBF), 2009 WL 2883060, at *11 (D.Conn. Sept. 3, 2009) (citing Ellis for this proposition). This is so because different decisionmakers may rely on different factors when deciding whether, or how severely, to discipline an employee. Ellis, 523 F.3d at 826; see also Smith v. Xerox Corp., 196 F.3d 358, 370–71 (2d Cir. 1999), overruled on different basis Meacham v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir. 2006) ("Because intent is the critical issue [in disparate treatment cases], only a comparison between persons evaluated by the same decision-maker is probative of discrimination.").

The plaintiff has not addressed this argument; however, the Court still views the facts in the light most favorable to the plaintiff. Although all four investigations were separately conducted by different individuals, viewing the facts in the light most favorable to the plaintiff, it appears that many of the same directors reviewed the investigative reports and recommended whether or not to discipline the particular corrections officer. Additionally, both Donovan and White participated in a Loudermill hearing before what appears to be the same committee. Most importantly, Commissioner Theresa Lantz appears to have the final decisionmaking power on all of the disciplinary decisions against all four officers. Thus, the final disciplinary decision would

---

[9] Captain Robert Quiros investigated Friedman; Captain Denise Walker investigated Pelkey; Captain Noel Richards investigated Donovan; and Captain Richard Bowles investigated White.

have been made by the same decisionmaker. Therefore, for the purposes of summary judgment, the Court finds that White was similarly situated with Donovan, Friedman, Pelkey.

As evidence that these similarly situated individuals were disparately treated, White points to the difference in penalties applied to himself versus Donovan, Pelkey, and Friedman. Specifically, White notes that he was the only accused officer whose employment was terminated and that the DOC seemed to give less credence to Rivera's statements about the Caucasian officers. For example, although Rivera appeared to know many details about Pelkey's personal life, the Director of Security noted that how that information was obtained was "questionable." Moreover, with regard to Friedman, the DOC found the allegations could not be substantiated against him because there were no witnesses or other evidence against him. Thus, both Pelkey and Friedman had findings of no violations entered against them.[10]

Additionally, Captain Noel Richards's investigation found that Officer Donovan violated Administrative Directive 2.17 and numerous recommendations of violations were made by various directors; however, after the Loudermill hearing, the committee ultimately decided that Officer Donovan did not violate any directives. Although the committee found that Donovan conversed with Rivera for extended periods of time, she was merely transferred to another unit and received a letter of counseling. Conversely, White was dismissed after the committee reviewed the similar allegations against him. Therefore, the difference in penalty for these similarly situated employees satisfies White's minimal burden of demonstrating a prima facie

---

[10] The Court recognizes that the initial investigations for both Friedman and Pelkey had found no violation occurred, whereas the investigation for White found a violation; however, for the purposes of the plaintiff's prima facie case on summary judgment, this fact is not dispositive.

case of discrimination.[11]

ii.    *Legitimate Non-Discriminatory Reason*

DOC contends that even if White has demonstrated a prima facie case of discrimination, it has put forward a legitimate, non-discriminatory reason for dismissing White—namely White's apparent violations of Administrative Directives 2.17 and 6.6.  In support, DOC cites the undisputed fact that White received two sexually explicit notes from Inmate Rivera and did not immediately report them.  DOC also points to statements from White's interview with Captain Bowles in which he stated he had "no clue" why he did not report the sexually explicit notes earlier and answered "not to my recollection" to a number of questions including whether he referred to Rivera's notes as his "fix;" whether he had ever complimented Rivera's hair, eyes, makeup or buttocks; whether he ever told Rivera he wanted to touch her buttocks; whether he used Rivera's lotion; and whether he and Rivera wrote each other notes in his notebook.

White also refused to show the investigator his notebook even though he had it with him at the time of the interview.  White had no response to the claims that the visits with Rivera looked "bad, inappropriate and weird," and he also had no response to the claims he had a

---

[11] DOC also argues that White cannot demonstrate a prima facie case of discrimination because two of the individuals who recommended his termination were African American. However, the Supreme Court has rejected any conclusive presumption that an individual would not discriminate against his or her own race.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998).  Moreover, here, as in Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004), the two African American employees were not the only officials to recommended dismissal and it is not clear that they were the ultimate decisionmakers.  Therefore, although a small inference may be drawn against discrimination, this inference is insufficient to prevent White from meeting his minimal burden of establishing a prima facie case.  Additionally, because the Court finds that the plaintiff has demonstrated a prima facie case of discrimination for the purposes of summary judgment, the Court declines to address the plaintiff's arguments regarding the alleged delay in the investigations of the Caucasian officers and the alleged difference in treatment of the officers during the pendency of the investigations.

reputation as a "player" with the inmates.  In answer to whether he had ever touched Rivera's stomach, he answered "as far as my recollection, no."  He answered similarly when asked whether he ever told Rivera he could "switch her to the other team."  These responses, coupled with White's delay in failing to report the notes, is sufficient for the purposes of summary judgment to satisfy the defendant's burden of production on the issue of a non-discriminatory reason.

*iii.*    *Pretext*

The extent of the plaintiff's burden to demonstrate pretext varies on a case-by-case basis.  See Skiff v. Colchester Bd. Of Educ., 514 F. Supp. 2d 284, 298 (D.Conn. 2007).  "[W]hether the evidence is sufficient to withstand summary judgment depends on the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case."  Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148–49 (2000)).

According to White, there exists a material issue of fact regarding the truth of DOC's explanation.  A plaintiff may demonstrate pretext by showing that the employer's explanation is "unworthy of credence."  Reeves, 530 U.S. at 143.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  Id. at 147.  If, however, the plaintiff only creates "a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted evidence that no discrimination had occurred," then the defendant is entitled to judgment as a matter of law.  Id. at 148.

White relies on evidence similar to his evidence of a prima facie case to show pretext.  In

particular, he focuses on the strength of the "case" against Donovan, the questionable nature of the evidence against him, and the disparity in ultimate treatment between the two officers.[12]

A genuine issue of material fact exists about whether the defendant's non-discriminatory reason for firing White was a prextext for discrimination. Viewing all facts in the light most favorable to the plaintiff, it appears that the pre-Loudermill comments regarding Officer Donovan, as well as the quantity and quality of the "evidence" supporting a finding of "undue familiarity" against her, were at least as strong as the evidence against White. For example, four correctional officers gave statements regarding the inordinate amount of time Donovan spent in Rivera's cell. According to White, and as it appears thus far, there does not seem to be any basis for discrediting the observations of these officers. Conversely, the two officers who gave statements about White (Colmenares and Brown), at least arguably, had a retaliatory or questionable motive to give these statements. Moreover, Rivera was able to provide some accurate information about Donovan, such as tattoos, piercings, and family members.[13] Although Rivera also possessed some personal information about White, White has provided evidence that Rivera had a questionable motive to possibly falsify her accusations against him.[14]

---

[12] The Court additionally considers the facts surrounding the lack of discipline for Officers Friedman and Pelkey as relevant to plaintiff's claim of pretext; however, because these officers never reached the Loudermill stage like Donovan and White, the disparity in discipline between them and White is of less probative value in demonstrating pretext.

[13] It is important to note, however, that investigation found that this personal information was not entirely accurate in a number of respects.

[14] Aside from Rivera's general pattern of making sexual allegations, White specifically points to a 2005 statement from Rivera where she stated that she felt like White was the cause of her being moved from one side of the prison to another, as evidence that Rivera had a retaliatory motive against him.

Despite the evidence against Donovan and the possibly questionable motives of the witnesses against White, White received the penalty of dismissal, while Donovan was merely transferred and received a letter of formal counseling. No evidence has yet been presented regarding how the DOC weighed the evidence from the investigations and presented at the Loudermill hearings. Moreover, DOC has not offered any explanation for the difference in treatment between Donovan and White other than that White was a supervisor.[15] Although DOC has argued that other African American employees who have been investigated for charges of undue familiarity have not been dismissed, this evidence does not demonstrate a lack of pretext as a matter of law in this case. Making all reasonable inferences in the plaintiff's favor, a reasonable jury could conclude that the difference in treatment was due to discrimination. See Graham, 230 F.3d at 43 ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate non-discriminatory reason for the adverse job action was a pretext for racial discrimination."). Therefore, viewing the facts in the light most favorable to the plaintiff, a genuine issue of material fact exists regarding whether the defendant's purported explanation is pretext, and defendant's motion for summary judgment on the plaintiff's race discrimination claim is denied.[16]

_____

[15] DOC has asserted that White failed to present evidence to mitigate the charges against him, but has not argued or demonstrated that any evidence presented by Donovan served to clear her of the allegations or was more persuasive.

[16] DOC also argues that the decision of the independent arbiter that White's termination was legitimate is evidence that the legitimate reason is not pretext. In Collins v. New York City Transit Auth., 305 F.3d 113, 115 (2d Cir. 2002), the Court of Appeals for the Second Circuit held that "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the

C.      Retaliation

Title VII also forbids retaliation against an employee for complaining of prohibited employment discrimination, stating that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by " Title VII.  42 U.S.C. § 2000e-3(a).  To defeat a motion for summary judgment on a claim of retaliation,

> the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find (1) that []he engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks and alterations omitted).  "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Id.

White filed a complaint with the DOC's affirmative action office on June 30, 2006,

---

arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive."  There, however, the Court acknowledged that if a Title VII plaintiff presents new evidence that was not before the arbitral tribunal, the strong probative weight of the arbitrator's decisions is decreased.  See id. at 119. Here, White has alleged, and it does not appear DOC disputes, that the arbitrator did not have all of the facts—particularly the disparity in treatment between him and the three individuals discussed in this case.  Moreover, White contends that those facts were not provided to him until discovery in this case.  Therefore, the administrative decision, although relevant, does not have the same probative weight that DOC argues and does not preclude the issue of pretext as a matter of law.

alleging disparate treatment of African American correctional officers. This action clearly constitutes protected activity, and it is undisputed that DOC took adverse action against White in the form of terminating his employment. Although DOC claims that White has not shown that any of the decisionmakers were aware that he filed the affirmative action complaint, DOC has not denied that the decisionmakers were aware of the complaint. Moreover, given that the Affirmative Action Office was a unit within the DOC and that Commissioner Lantz had later signed and acknowledged the ultimate finding of no violation by the Affirmative Action Office, it is a reasonable inference for the purposes of summary judgment that she was aware of White's protected activity in filing the complaint.

DOC also argues that no causal connection exists between the protected activity and the adverse action. First, DOC contends that White cannot make out a prima facie case of retaliation because he filed the complaint after he knew the Security Investigation had determined he engaged in undue familiarity. However, the claimed retaliation at issue here is not the investigation or the investigatory finding, but rather the ultimate decision to terminate White. Although White was aware that the *initial* investigation had taken place (resulting in a finding of undue familiarity), and that termination was a *possible* penalty, he was not aware that he was going to be terminated, and termination had not yet occurred.

DOC also argues that the decision to dismiss White had already been made by one of its principal personnel officers, Joel Schweidel, the day before White filed his affirmative action complaint. Making all reasonable inferences in the plaintiff's favor, however, this "decision" does not appear to be binding, as evidenced from the multi-level process of recommendations and ultimate approval by the Commissioner. See also Rodriguez v. City of New York, 644 F.

Supp. 2d 168, 193 (E.D.N.Y. 2008) (holding that a probationary police officer established a prima facie case for retaliation, even though the initial recommendation to terminate her employment was made three weeks before the protected activity, because the final termination decision was not made until after the protected activity). But cf. Murray v. N.Y. Univ. Coll. Of Dentistry, 57 F.3d 243 (2d Cir. 1995) (plaintiff not demonstrate retaliation where Academic Standing Committee already decided to make plaintiff repeat scholastic year prior to her notifying them about sexual harassment, and decision was later reaffirmed by the committee and approved by the Executive Faculty). Therefore, it appears that the final decision to terminate White was not made prior to his protected activity, but afterwards. Because of the short difference in time between White's protected activity and his dismissal—approximately one month—White can demonstrate a causal connection between his protected activity and the adverse employment action on summary judgment. See, e.g., Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002) (temporal proximity of one month between protected activity and adverse employment action sufficient to demonstrate causal link for purposes of prima facie case). Thus, White has demonstrated a prima facie case of retaliation for the purposes of summary judgment.

As noted above, DOC has demonstrated a legitimate non-discriminatory reason for White's termination—namely, White's violation of Administrative Directive 2.17 and 6.6. Therefore, White must demonstrate that the stated reason is merely pretext for retaliation. Aside from temporal proximity, White has presented evidence that Donovan—a similarly situated individual who it appears did *not* file an Affirmative Action complaint—was treated more favorably than White. See Lee v. City of Syracuse, 603 F. Supp. 2d 417, 437 (N.D.N.Y. 2009)

(discussing how differing treatment of similarly situated individuals supported plaintiff's claim of pretext).   As discussed, a genuine issue of fact exists over why DOC reached a conclusion of discharge for White but not for Donovan.  Making all reasonable inferences in the plaintiff's favor, a reasonable jury could find that DOC's decision to terminate White's employment was in retaliation for his complaint to the Affirmative Action Office.  Therefore, defendant's motion for summary judgment as to the retaliation claim is denied.

**III.**     **Conclusion**

Accordingly, the defendant's motion for summary judgment [Dkt # 23] is DENIED.

SO ORDERED this   24th    day of August 2010, at Hartford, Connecticut.


**/s/Christopher F. Droney                    **
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**